Izaak Schwaiger (CA 267888)
SCHWAIGER LAW FIRM
130 Petaluma Avenue, Suite 1A
Sebastopol, CA 95472
Tel: (707) 595-4414
izaak@izaakschwaiger.com

Matthew M. Fischer (FL 40997)
MATTHEW M. FISCHER, P.A.
1931 NW 150 Avenue, Suite 278
Pembroke Pines, FL 33028
Tel: (954) 859-5558
Fax: (954) 859-5525
matt@fischerlawpa.com
(Motion for Pro Hac Vice Forthcoming)

Yamina-Sarah Chekroun (NY 5501853)
VENTURE LAWYERS LLP
4610 Alton Road
Miami Beach, FL 33140
Tel: (347) 986-4426
sara@theventurelawgroup.com
(Motion for Pro Hac Vice Forthcoming)

*Attorneys for Plaintiff*

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| ROMEIN ROSTAMI, | CASE NO.: 22-CV-1813 |
| Plaintiff, | **COMPLAINT AND JURY DEMAND** |
| v. | |
| HYPERNET INC., HYPERNET LABS INC., IVAN RAVLICH, DANIEL MAREN, and TODD CHAPMAN, | |
| Defendants. | |
| _____/ | |

1
COMPLAINT

Plaintiff, Romein Rostami ("Plaintiff"), by and through undersigned counsel, sues defendants Hypernet, Inc ("Hypernet"), Hypernet Labs, Inc. ("HLI"), Ivan Ravlich ("Ravlich"), Daniel Maren ("Maren"), and Todd Chapman ("Chapman") (Ravlich, Maren, and Chapman collectively hereinafter the "Management Team") (Hypernet, HLI, and Management Team collectively hereinafter the "Defendants") and alleges as follows:

## INTRODUCTION

1.      This action seeks the return of 728 Ethereum cryptocurrency tokens which Defendants procured from Plaintiff through fraudulent means and the sale of unregistered securities.

2.      Hypernet is a start-up technology company that purports to create a solution to the problem of centralized cloud computing and was "poised to change the world by making high-performance parallel computing a consumer good."[1]   By doing so, Hypernet claimed, with its platform, individuals and companies could "lease [their] otherwise wasted computing power to other people that wants to use it – and be paid for it."[2]

3.      In the summer of 2018, Defendants offered and sold to the general public the future right to cryptocurrency tokens (that were to be used on the Hypernet platform) called "Hyper Tokens" to create the Hypernet platform, a decentralized network using Ethereum blockchain technology.

4.      Through these efforts, Defendants raised approximately $20 million in an initial coin offering ("ICO").  Plaintiff was one of the investors in the Hypernet project, having invested 728 Ethereum cryptocurrency tokens which at the time equated to $339,248.00.

---

[1] https://becominghuman.ai/welcome-to-the-hypernet-powered-by-you-95dbbfe7dfa6

[2] *Id.*

5.      However, Defendants never created a functional platform nor the Hyper Token. Instead, Defendants lied to investors through industry whitepapers, pay to play promotional advertising, and other fraudulent marketing gimmicks to induce investment and utilized the venture as a vehicle to perpetuate fraud for greater financial gain.

6.      Defendants' offer and sale of Hypernet Tokens was rife with misleading and misrepresentative material statements and omissions and was not registered as a security with the U.S. Securities and Exchange Commission.

7.      In anticipation of future investor scrutiny and to deter potential litigation (such as this action) and liability, Ravlich, Maren, and Chapman, the individuals behind and controlling Hypernet and HLI, structured and carried out their fraudulent scheme as follows:

(i)      Ravlich, Maren, and Chapman directed employees and/or agents of Hypernet to force investors, such as Plaintiff, to sign a contract of adhesion with Hypernet, a business entity purportedly formed in the Cook Islands (well known for its privacy and offshore protection for individuals) despite the Management Team and company entities at issue herein being physically based and operating out of the State of California;

(ii)     In such contracts of adhesion, Ravlich, Maren, and Chapman, through Hypernet, forced investors to agree to seek the resolution of any disputes in the Cook Islands pursuant to Cook Islands law and again, despite the Management Team and companies at issue herein being based and operating out of the State of California; and

(iii)    Prior to offering the ICO to investors, Ravlich, Maren, and Chapman created a sham agreement between Hypernet and HLI, both of which are

3
COMPLAINT

owned and operated by the Management Team, whereby HLI agreed to allegedly develop the Hypernet platform and Hyper Token for Hypernet in exchange for all investor funds received as a result of Hypernet's ICO under the guise of compensation.

In other words, Ravlich, Maren, and Chapman created a sham company abroad to deter investors from recouping losses and utilized the sham agreement to shift investor ICO funds to HLI, a United States based entity (having no privity of contract with investors), to pocket large sums of money for little to no development effort.

8.  Hypernet and HLI were mere instrumentalities used by Ravlich, Maren, and Chapman to perpetrate fraud and evade subsequent attempts by investors to seek the return of their investment.  In the operation of Hypernet and HLI, Ravlich, Maren, and Chapman failed to observe corporate formalities, purposely siphoned operating capital for their personal benefit, exercised crippling control over Hypernet's and HLI's operations and finances, and created a corporate façade through the exercise of such significant control to avoid the ends of justice.

9.  Defendants failed to produce any viable product, good, or service.  In sum, Ravlich, Maren, and Chapman, through Hypernet and HLI, enriched themselves at the expense of investors.  As a result of Defendants' wrongful conduct, Plaintiff has suffered damages and brings this action not only to recoup his investment but prevent Defendants from defrauding other investors in the future.

**THE PARTIES**

10.  Plaintiff is a citizen of the United States residing in the unincorporated United States territory of Puerto Rico.

4
COMPLAINT

11.     Hypernet is a corporation purportedly formed under the laws of the Cook Islands with its headquarters and principal place of business in Palo Alto, California.

12.     Upon investigation and according to the Cook Islands Ministry of Justice, the Cook Islands' government entity responsible for managing business entity registrations, neither Hypernet nor its alleged sole director (as indicated in the Agreement (defined below)), Clarion Ltd., were formed or are currently registered in the Cook Islands as of the filing of this Complaint.

13.     HLI, formerly known as Hyperdyne, Inc., is a for profit corporation formed under the laws of Delaware with its headquarters and principal place of business in Palo Alto, California.

14.     Ravlich resides in California and serves or served as HLI's Chief Executive Officer at all material times stated herein.  Upon information and belief, Ravlich co-controls and is a co-principal behind Hypernet along with Maren and Chapman.

15.     Maren resides in California and serves or served as HLI's Chief Financial Officer at all material times stated herein.  Upon information and belief, Maren co-controls and is a co-principal behind Hypernet along with Ravlich and Chapman.

16.     Chapman resides in California and serves or served as HLI's Chief Technical Officer at all material times stated herein.  Upon information and belief, Chapman co-controls and is a co-principal behind Hypernet along with Ravlich and Maren.

**JURISDICTION AND VENUE**

17.     This Court has jurisdiction under 28 U.S.C. § 1332 in that the amount in controversy exceeds $75,000, and Plaintiff and Defendants are citizens of different states.

18.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1) - (3) upon information and belief, and because:

(i)     The wrongful conduct was directed and undertaken within the territory of this District; and

(ii)    Defendants maintained regular contacts with and conducted a substantial portion of its business in this District.

## FACTUAL BACKGROUND

### A.     Blockchain Technology

19.     Blockchain is an electronic distributed ledger or list of entries – much like a stock ledger – that is maintained by various participants in a network of computers.  Blockchains use cryptography to process and verify transactions on the ledger, providing comfort to users and potential users of the blockchain that entries are secure.  Well-known examples of blockchain technology are the Bitcoin and Ethereum virtual currencies.

20.     Blockchains generally record all transactions in the network in theoretically unchangeable, digitally recorded data packages called "blocks."  Each block generally contains a batch of records of transactions, including a timestamp and a reference to the previous block, linking the blocks together in a chain, hence the term "blockchain."

21.     For a transaction to be valid on the blockchain, all network participants generally first reach a "distributed consensus" on the validity of transactions under review.  Blockchains reach consensus by using the same cryptographic algorithm to verify each transaction submitted to the blockchain.  Once a transaction is validated on the blockchain, the transaction cannot be cancelled, reversed, or altered in any way.

### B.     Hypernet's ICO and the Funding of its Alleged Business

22.     In order to raise money to fund the development of the alleged network, Hypernet offered and sold Hyper Tokens in an ICO.

6
COMPLAINT

23.     An ICO is the cryptocurrency industry's equivalent to an initial public offering for stocks.  Persons and/or entities creating blockchains often create and disseminate crypto securities in the form of virtual tokens or coins.  A token or coin may entitle its holders to certain rights related to an underlying venture, such as rights to profits, share of assets, rights to use certain services provided by the issuer, and/or voting rights.  The tokens or coins may also be traded on online exchanges in exchange for virtual or fiat currencies.

24.     Hypernet first launched its ICO in 2018.

25.     Hypernet sold Hyper Tokens in exchange for U.S. dollars, Bitcoin, or Ethereum through purchase agreements referred to as a Future Token Interest Subscription Agreement ("TSA").

26.     Hyper Tokens were sold at discounts relative to the regular cost per token as follows:

| | TIER | LOCK-UP (STARTS FROM MAINNET LAUNCH) | PRICE ($) |
|---|---|---|---|
| / PRIVATE SALE / | Tier 1 | – **18-month lock-up**<br>– 9-month cliff<br>– Monthly linear release after the cliff period | – 0.25 |
| | Tier 2 | – **12-month lock-up**<br>– 6-month cliff<br>– Monthly linear release after the cliff period | – 0.45 |
| | Tier 3 | – **6-month lock-up**<br>– 3-month cliff<br>– Monthly linear release after the cliff period | – 0.65 |
| | Tier 4 | – Principal tokens unlocked at the TGE<br>– Bonus tokens: 6-month lock-up, monthly linear release | – 0.85 or Public sale price with a bonus number of tokens equal to 20% of the tokens purchased |

27.   The investors' payments — the approximately $20 million invested by token holders who contributed fiat currency and/or cryptocurrency of value during the ICO — was pooled and funded Hypernet.  Unbeknownst to investors (including Plaintiff), Hypernet, HLI, Ravlich, Maren, and Chapman made the knowing, willful, and intentional misrepresentations contained herein with the intent of never producing a viable platform or the Hyper Token.

**C.   Plaintiff's Agreement**

28.   On July 25, 2018, Plaintiff entered into two separate TSAs with Hypernet (collectively the "Agreement") for the future right to Hyper Tokens.  Copies of the TSAs are attached hereto as Exhibit A.

29.   The Agreement represents and warrants the following:

(i)   "[the Management Team] holds deep expertise in distributed computing, cryptography, networks, blockchain technology, security, software engineering, open-source technology, and operations."

(ii)   "Hypernet is designed as a decentralized network powered by an ERC-20 compliant token deployed on the Ethereum network..."

(iii)   "A core feature of Hypernet is to match buyers who need computing power with sellers who can offer idle computing resources for sale, such as their personal computing devices, thus creating a decentralized computing network for tasks requiring intensive computation."

(iv)   "Hyper Tokens will be used to buy and sell computing power, to stake collateral, to establish user reputations, to determine priority, to incentivize early network adoption, to facilitate decentralized governance, and to vote on upgrades or changes to the Hypernet protocol."

30.     Moreover, the Agreement bolstered the venture utilizing the backgrounds of the Management Team.  For example, the Agreement states in pertinent part:

(i)     Ravlich is involved in "Ph.D. research at Stanford focused on advanced space propulsion from magneto plasma rockets to extended theories of gravity."

(ii)    Maren is "an expert in international infrastructure development."

(iii)   Chapman is a researcher of "fault-tolerant algorithms for distributed and exascale computing and applying optimal control methods for training stabilized neural network architectures."

31.     Hypernet drafted the TSA to lead investors, as with Plaintiff and his Agreement, to believe that the greatest risk with the investment into Hypernet and the Hyper Token was not that the platform and token would never be developed, launched, or distributed but rather that "the prices of blockchain assets such as Bitcoin and Ethereum have historically been subject to dramatic fluctuations and are highly volatile, and the market price of the [Hyper Tokens] may also be highly volatile" or in other words, would provide the opportunity for investment profit.

32.     On behalf of Hypernet, Plaintiff's Agreement was signed by an "Antony Will" as an "authorized signatory."  Antony Will is an attorney based and licensed to practice law in the Cooks Islands.[3]  Antony Will is the managing director of the Cook Islands Trust Corporation Ltd., a company allegedly specializing in "trustee services."  Antony Will was hired and instructed by Ravlich, Maren, and Chapman to act as Hypernet's agent for the ICO in order to conceal their involvement and assist in carrying out their fraudulent scheme.

---

[3] https://cookfoundation.org/about-us/board-of-trustees/antony-will/

**D.     Defendants' Marketing Tactics to Fraudulently Induce Investment**

33.     To enhance the public's belief in the need for and effectiveness of Hypernet's platform and the Hyper Token, Defendants made bold promotional representations and used public channels to solicit and encourage the attention of Plaintiff and other investors in its ICO with whom Defendants did not have any prior relationship.

34.     Defendants promoted the Hypernet platform and the Hyper Token through various media, including websites and through blog posts, social media posts, online videos, presentations, and online discussion boards.

35.     For example, Hypernet, Ravlich, Maren, Chapman, and HLI published and/or posted a written document, referred to as a "whitepaper," on various websites and other online media, describing the venture's alleged technology, revenue model, and business plan.

36.     Specifically, Hypernet's whitepaper represented the following:

(i)     Hypernet is "partnering with developers to create a solution to the problem of centralized cloud computing: the Hypernet Protocol, the first public resource computing network capable of providing true parallel computing."

(ii)    The Hypernet ecosystem is "a decentralized platform that connects individuals and companies who need computing power with those who want to sell time on their idle networked machines."

(iii)   Hypernet would build and launch the "Hypernet protocol in order to make high performance parallel computing a consumer good" which would use the Hyper Tokens issued from the ICO as the currency for the Hypernet platform, allowing for the buying and selling and of unused computing

10
COMPLAINT

power, and grant token holders with voting powers to manage the Hypernet platform.

(iv)   "This technology will finally empower consumers to take on ambitious, novel, massively parallel projects in big data, AI, and modeling with the tools to compete against the likes of Google, Amazon, and Facebook – and win."

(v)   "Hypernet is ready to revolutionize the parallel processing paradigm and everyone can be a part of it."

37.   Ravlich, Maren, and Chapman also leveraged their contacts, including contacts at their alma mater, Stanford University, to widely advertise Hypernet's ICO in nearly every possible forum available at the time and attract favorable press.  Among others, this included a Facebook group, a Github, a Telegram channel, LinkedIn page, Medium blog, and YouTube channel.

38.   In each of these forums, Defendants indicated that the role of the Hyper Token would be as the transactional currency on the platform.  For example, Ravlich, Maren, and Chapman created and posted the following on ICOdrops.com - a website promoting investments into ICOs:

**COLLATERAL**

Selling time on personal devices dramatically slashes the cost of computing by eliminating cumbersome operating expenses. Despite the fact that energy is the main resource used for compute, upwards of 70% of the operating costs of data centers are infrastructure, hardware, and cooling.

**REPUTATION**

A user's reputation increases by being a reliable and responsible compute provider and compute purchaser, and this reputation is permanently logged on the blockchain. A user's reputation increases the likelihood of participating in compute jobs.

**CURRENCY**

HyperTokens are the transactional currency which enables the buying and selling of compute on the network.

**AVAILABILITY MINING**

Individuals can mine HyperTokens while waiting for compute jobs, by just being available in the lobby. This incentivizes users to join the network and make their devices available. While in the lobby, users can challenge other idle devices to see if they are truly online. If they fail a challenge their collateral is collected by the challenger. The amount of tokens available for mining decreases over time, so signing up devices early earns the most tokens.

**DECENTRALIZED GOVERNANCE / VOTING**

Nodes participate in challenge and response and are incentivized for helping maintain the quality of the network, and weeding out bad actors. Each node pings other nodes in a challenge/response mechanism to determine if they truly are on when they say they are on. Major changes in the network may be voted on, with your vote weighted by the amount of HyperTokens you hold.

39.    Moreover, Ravlich leveraged his contacts to attract favorable press coverage in widespread media such as podcasts to promote investment in the Hyper Token:



Ivan Ravlich Retweeted

The Life of Car ✝ @ThrillerX_ · Mar 13, 2018

Had an Amazing talk with the 🚀 Brilliant @ivanravlich CEO of @GoHypernet He explains the Hypernet Protocol and graciously talks about the competitors in the space. soundcloud.com/user-943750262...
#SXSW2018 #CryptoSummit #ATX #ThrillerPodcast #Live #Podcast #Ethereum #Blockchain #PreICO

40.    In January 2018, Defendants began posting articles about Hypernet on the Hypernet Medium blog and as with every promotional act by Defendants, each communication originates from either, or a combination of, Hypernet, Ravlich, Maren, Chapman, and/or HLI.  For example,

1    the following post indicates authorship by Ravlich, the "Hypernet Team" (i.e., Maren and

2    Chapman), and HLI:

Hypernet solves all the problems posed by servers and the cloud. As devices join
our network, you don't have to pay for the cost of those devices. Furthermore,
the combined power of those devices is greater than that of a server system. Also,
Hypernet distributes the computational workload across a cluster of internet
connected devices, starting with the ones nearest to you (subject to your
constraints for processor speed, RAM, etc.) This means you don't pay a hardware
premium and you don't have to worry about having too few computers or too
much latency.

If you're excited about the implications of Hypernet technology and are
wondering how it works along with more technical details, stay tuned for our
next post. We'll reveal exactly how our algorithms run and how they are different
from anything else available.

Best,

Ivan Ravlich and the Hypernet Team


t.me/hypernettoken


👏 76   💬

**Hypernet Labs**
432 Followers

Hypernet harnesses blockchain tech and cloud
power data science, simulations, AI, and other
computing work.

Follow

4    41.    Many articles seeking investments into the Hypernet ICO, such as this one from

5    April 27, 2018, were signed by "The HyperTeam" (i.e., Ravlich, Maren, and Chapman) and

6    indicated, specifically by them, that they were operating in Palo Alto, California – not the Cook

7    Islands:

If you're interested in finding out more, we are always available to answer
questions in our Telegram early supporter community. We hope to see you there!

-The HyperTeam
Palo Alto, California


👏 846   💬

COMPLAINT

42.     Defendants also solicited investment into Hypernet's ICO on ICOmarks.com making it clear that Ravlich, Maren, and Chapman, whether on behalf of Hypernet or HLI, was in charge of the ICO itself and not merely issuing the Hyper Token and developing the Hypernet platform or protocol:

/ MEET THE TEAM /

  

/ IVAN RAVLICH /          / TODD CHAPMAN /          / DANIEL MAREN /

43.     Defendants marketing also included numerous tweets via Twitter.  The content of these tweets falsely led the public to believe that the Hyper Token was in some way related to Bitcoin or Ethereum in an effort to take advantage of the interest in Bitcoin and Ethereum to raise funds for a token they would never issue.  For example, Ravlich, Maren, and/or Chapman, as Hypernet, used Twitter to share paid-for reviews of their ICO which were fabricated to lead Plaintiff and other investors into believing their ICO had the highest rating:



2

3       44.     Moreover, Defendants shared paid-for promotional articles on their social media.

4   For example, Hypernet and Ravlich shared the following Forbes article which falsely bolstered

5   Hypernet and the Management Team during the ICO titled "The Stanford Bitcoin Mafia":

6



45.     Defendants also encouraged and solicited investment in the Hyper Token with potential and actual investors through messaging channels.

46.     For example, Ravlich, Maren, and Chapman, among others, served as "admins" of the Hypernet Telegram, where they regularly promoted to the members of their community information about the Hypernet ICO, including investment information and other promotional materials:



47.     Despite never issuing the Hyper Tokens that were purchased by investors in the ICO (nor developing the Hypernet platform), HLI announced in November 2019 that it had raised $10 million from venture capital firms to allegedly develop a new and separate platform called Galileo.  At the time of this announcement and as of the filing of this Complaint, Plaintiff has still not received any Hyper Tokens nor has a platform been created where the Hyper Tokens would serve as the network currency.  In other words, Ravlich, Maren, and Chapman used the prestige of their Stanford backgrounds to obtain additional investment while failing to meet their pre-existing obligations:



## Hypernet Labs raises $10 million to 'democratize' data science

*Image Credit: Hypernet Labs*

*Join today's leading executives online at the Data Summit on March 9th. Register here.*

Democratizing data science is an ambitious mission, but that's just what the founders of Hypernet Labs hope to achieve with Galileo. It's a low-code solution that eliminates the need to set up virtual machines and spend excessive time on DevOps tasks, an idea so attractive that it's caught the attention of a raft of investors.

Palo Alto-based Hypernet today announced that it's secured $10 million from 500 Startups, Sovereigns Capital, DHVC, Velorum Capital, Southpark Commons, and Decentral Park Capital, which CEO Ivan Ravlich says will lay the runway for the launch of Galileo. "The worlds of engineering and science are greatly in need of modern tools to help engineers, researchers, and scientists achieve their goals without needing to hire expensive, specialized DevOps or cloud engineers," said Ravlich, who cofounded Hypernet earlier this year with Todd Chapman and Daniel Maren, alongside a team of Stanford physicists, computer scientists, aerospace engineers, and entrepreneurs.

**E.      Plaintiff's Reliance**

48.      Before considering the Hyper Token investment, Plaintiff conducted due diligence which included a review of Defendants' public misstatements and misrepresentations of material facts, including those published and made on social media, social networks, paid for press, public and private conferences, and other media referenced herein.  For example, among others, Plaintiff relied on Defendants' statements concerning the following: (i) the Management Team's credence as purportedly credible innovators in blockchain based on their favorable media coverage and their

17
COMPLAINT

strategic partnerships; (ii) Hypernet had created a viable product that would disrupt the cloud computing industry; and (iii) the purportedly high value of, and ability to profit from, Hyper Tokens.

49.     In reliance of such material misstatements and misrepresentations, Plaintiff transferred 728 Ethereum cryptocurrency tokens to a cryptocurrency wallet owned and controlled by Ravlich, Maren, and/or Chapman to invest in Hypernet and the Hyper Token.

50.      Defendants enticed Plaintiff to purchase Hyper Tokens by publicly and privately, making misstatements, misrepresentations, and omissions of material facts, including, but not limited to, the foregoing, non-exhaustive examples contained herein.

51.     Plaintiff detrimentally relied on Defendants' misstatements, misrepresentations, and omissions of material facts contained herein when he decided to purchase Hyper Tokens.

52.     Defendants knowingly, willfully, and/or intentionally made these misstatements, misrepresentations, and omissions of material fact, knew that they were false, and did not intend to honor their obligations for greater financial gain.

53.     Despite receiving $20 million from investors in the ICO, Defendants have never provided Plaintiff with a Hyper Token nor produced a Hypernet platform.

**CAUSES OF ACTION**

**COUNT I – FRAUD IN THE INDUCEMENT**
**(Against All Defendants)**

54.     Plaintiff realleges and incorporates by reference the allegations contained in paragraphs 1 through 53 above as though fully set forth herein.

55.     Ravlich, Maren, and/or Chapman, individually and/or as Hypernet and/or HLI, made material misrepresentations of fact on multiple occasions, including, but not limited to: (i)

18
COMPLAINT

Defendants had created a viable product that would disrupt the cloud computing industry; (ii) Defendants hold deep expertise in cryptography and blockchain technology; (iii) Hypernet will be a decentralized network powered by an ERC-20 compliant token deployed on the Ethereum network; (iv) Hyper Tokens can be used to buy and sell computing power, to stake collateral, to establish user reputations, to determine priority, to incentivize early network adoption, to facilitate decentralized governance, and to vote on upgrades or changes to the Hypernet protocol; and (v) Hyper Tokens would be in high demand with the ability to profit off such demand.

56.     Defendants knowingly, willfully, and/or intentionally made these representations, knew that they were false, and did not intend to honor their obligations for greater financial gain. Specifically, Defendants never intended to disrupt the cloud computing industry and create a viable Hyper Token or Hypernet platform.

57.     Defendants made such misrepresentations for the purpose of inducing Plaintiff to rely upon them.  Defendants reasonably expected that their promise to deliver Hyper Tokens to Plaintiff would cause Plaintiff to act, specifically to invest in Hypernet.

58.     Plaintiff justifiably relied on the false statements when Plaintiff performed all of his obligations to purchase Hyper Tokens.

59.     As a direct and proximate result of Defendants' misstatements, misrepresentations, and omissions, Plaintiff has suffered damages.

## COUNT II – UNJUST ENRICHMENT
### (Against All Defendants)

60.     Plaintiff realleges and incorporates by reference the allegations contained in paragraphs 1 through 53 above as though fully set forth herein.

61.     Plaintiff conferred a benefit upon Defendants when he provided investment capital to Defendants in connection with the Agreement to purchase Hyper Tokens.

62.     Defendants knowingly received this benefit.

63.     Defendants retained this benefit and continue to enjoy the fruits of his labor at Plaintiff's expense.

64.     Under the circumstances of this case, it would be inequitable for Defendants to retain the benefit without compensating Plaintiff.

65.     As a direct and proximate result, Defendants have been unjustly enriched, and Plaintiff has suffered damages.

66.     Plaintiff does not have an adequate remedy provided by law.

**COUNT III – BREACH OF IMPLIED COVENANT**
**OF GOOD FAITH AND FAIR DEALING**
**(Against Hypernet and Management Team)**

67.     Plaintiff realleges and incorporates by reference the allegations contained in paragraphs 1 through 53 above as though fully set forth herein.

68.     Plaintiff entered into the Agreement with Hypernet and fully performed with regard to all conditions and obligations under the Agreement.

69.     With every agreement a covenant of good faith and fair dealing exists that requires that neither party shall do anything that will have the effect of destroying or injuring the right of the other party to the fruits of the contract.

70.     Hypernet invited Plaintiff to serve as an investor and contributor for its blockchain project in exchange for investment.

71.     Hypernet breached the covenant of good faith and fair dealing when Hypernet misrepresented to Plaintiff numerous material facts as a way to induce his investment in the Hyper

1   Token and Hypernet platform under the false promise of future profit and a highly desirable new

2   blockchain network, and thereafter refused to generate any return on Plaintiff's investment.

3         72.    Hypernet was well aware of Plaintiff's reasonable expectation of generating a

4   return on his investment.

5         73.    As a direct and proximate result of Hypernet's breach of the covenant of good faith

6   and fair dealing, Plaintiff has suffered damages.

7               **COUNT IV – CIVIL CONSPIRACY**
                  **(Against Hypernet and HLI)**

8         74.    Plaintiff realleges and incorporates by reference the allegations contained in

9   paragraphs 1 through 53 above as though fully set forth herein.

10         75.    Hypernet and HLI conspired with one another to perpetrate an unlawful act or to

11   perpetrate a lawful act by unlawful means against Plaintiff.

12         76.    Hypernet and HLI entered into a sham agreement with one another in which

13   Hypernet agreed to transfer all funds raised as a result of the ICO to HLI under the guise of

14   compensation for the purported development of the Hypernet platform and the Hyper Token or in

15   other words, to shift investor ICO funds to a United States based entity (having no privity of

16   contract with investors) to pocket large sums of money for little to no development effort.

17         77.    Hypernet and HLI conspired to enter into such agreement with the intent of utilizing

18   Hypernet as a shell company and making it insolvent for liability protection purposes in the event

19   investors were to bring legal action for investment losses due to the failure to develop the Hypernet

20   platform and Hyper Token.

78.     Hypernet and HLI, by their entry into and execution of the agreement to develop the Hypernet platform and Hyper Token, each undertook overt acts in furtherance of their conspiracy.

79.     As a direct and proximate result of Hypernet's and HLI's conspiracy and the acts in furtherance of such conspiracy, Plaintiff has suffered damages.

## COUNT V – ALTER EGO LIABILITY
### (Against Management Team)

80.     Plaintiff realleges and incorporates by reference the allegations contained in paragraphs 1 through 53 above as though fully set forth herein.

81.     At all times material hereto, the Management Team were the principals, managers, alter-egos, officers, and/or directors of Hypernet and HLI.

82.     The Management Team acted within the scope of their agency, affiliation, management, and/or alter-ego relationship of Hypernet and HLI.

83.     The Management Team actively participated in or subsequently ratified and adopted, or both, all of the acts or conduct taken by Hypernet and HLI, with full knowledge of all of the facts and circumstances, including, but not limited to, full knowledge of each and every violation of Plaintiff's rights and the damages to Plaintiff proximately caused thereby.

84.     At all times material hereto, a unity of interest and ownership by the Management Team with respect to Hypernet and HLI existed or in other words, a single economic unit operated, such that any individuality and/or separateness between them ceased to exist.

85.     Hypernet and HLI were mere instrumentalities used by the Management Team to perpetrate fraud and a conduit through which the Management Team carried on their business for

their sole benefit.  Hypernet and HLI are controlled, dominated, and operated by the Management Team as their individual businesses and alter egos.

86.    In the operation of Hypernet and HLI, upon information and belief, the Management Team failed to observe corporate formalities.  Specifically, corporate records were not maintained, resolutions were passed and agreements entered into without necessary approvals and in the case of Hypernet, no actual corporate entity was ever formally registered or such entity was administratively dissolved or made inactive by the Cook Islands Ministry of Justice.

87.    In the operation of Hypernet and HLI, upon information and belief, the Management Team purposely siphoned operating capital for their personal benefit that they were not legally entitled to receive.  Specifically, members of the Management Team improperly siphoned operating capital by paying themselves above market salaries not commensurate with a technology start-up company, using company operating capital to pay personal expenses, and by paying inflated compensation to third party entities (also owned by the Management Team) for unnecessary "strategic partnerships" to permit double-dip siphoning of operating capital.

88.    In the operation of Hypernet and HLI, upon information and belief, the Management Team exercised complete control over the operations and finances creating a corporate façade.  Specifically, the Management Team excluded officers, directors, advisors, employees, and other third-party contractors from all material operations and financial decisions.

89.    The Management Team created Hypernet as a shell company abroad to deter investors from recouping losses and utilized a sham agreement to shift investor ICO funds to HLI, a United States based entity (having no privity of contract with investors), to pocket large sums of money for little to no development effort.  Upon information and belief, Hypernet is insolvent and was never intended to be kept active and in operation.

23
COMPLAINT

1    90.    As a result of the foregoing, Plaintiff has suffered damages and is entitled to a

2    judgment against the Management Team, jointly and severally.

3                                    **PRAYER FOR RELIEF**

4         WHEREFORE, Plaintiff requests judgment in its favor and against Defendants as follows:

5    (i)      Impose a constructive trust on and order the return of, along with any profits derived

6             from investing, staking, and/or yield farming, the 728 Ethereum cryptocurrency

7             tokens transferred by Plaintiff to Defendants;

8    (ii)     Award compensatory damages arising out of Defendants' knowing, willful, and/or

9             intentional conduct;

10   (iii)    Award punitive damages for Defendants' knowing, willful, and/or intentional

11            conduct;

12   (iv)     Award pre and post judgment interest as permitted by law; and

13   (v)      Award such other and further relief as the Court may deem just and proper.

14                                  **DEMAND FOR JURY TRIAL**

15        Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff hereby demands a

16   trial by jury.

17

18

19

20

21

22

23

COMPLAINT

1    Date: March 22, 2022                    Respectfully Submitted,

2                                            /s/ Izaak Schwaiger
                                             Izaak Schwaiger (CA 267888)
3                                            SCHWAIGER LAW FIRM
                                             130 Petaluma Avenue, Suite 1A
4                                            Sebastopol, CA 95472
                                             Tel: (707) 595-4414
5                                            izaak@izaakschwaiger.com

6                                            Matthew M. Fischer (FL 40997)
                                             MATTHEW M. FISCHER, P.A.
7                                            1931 NW 150 Avenue, Suite 278
                                             Pembroke Pines, FL 33028
8                                            Tel: (954) 859-5558
                                             Fax: (954) 859-5525
9                                            matt@fischerlawpa.com
                                             (Motion for Pro Hac Vice Forthcoming)

10

                                             Yamina-Sarah Chekroun (NY 5501853)
11                                           VENTURE LAWYERS LLP
                                             4610 Alton Road
12                                           Miami Beach, FL 33140
                                             Tel: (347) 986-4426
13                                           sara@theventurelawgroup.com
                                             (Motion for Pro Hac Vice Forthcoming)

14
                                             *Attorneys for Plaintiff*